UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————————

August Term 2022

(Argued: April 18, 2023 | Decided: August 2, 2023)

Docket No. 22-1000

KIMBERLY BRUCE, Debtor and Plaintiff on behalf of herself and all others
similarly situated, AKA Kimberly A. Bruce, AKA Kimberly Antrell Bruce,

*Plaintiff-Appellee,*

v.

CITIGROUP INC. and CITIBANK, N.A.,

*Defendants-Appellants.*[1]

————————————

Before: WESLEY, PARK, and ROBINSON, *Circuit Judges*:

Defendants-Appellants Citigroup Inc. and Citibank, N.A. (collectively, "Citi") appeal from the bankruptcy court's order granting in part and denying in part Citi's motion, pursuant to Federal Rule of Bankruptcy Procedure 7012, to dismiss Plaintiff-Appellee Kimberly Bruce's amended complaint, or, alternatively, to strike or dismiss the nationwide class action allegations therein.

On appeal, Citi advances two primary arguments. First, Citi argues that a bankruptcy court's civil contempt power is limited to the enforcement of its own orders, and, therefore, that the Bankruptcy Code does not authorize one bankruptcy court to adjudicate the claims of a nationwide class of former debtors

---

[1] The Clerk of the Court is directed to amend the official caption as set forth above.

seeking to hold Citi in contempt of discharge orders entered by other bankruptcy courts across the country. Second, Citi argues that plaintiff's claim for violation of her discharge order and injunction under 11 U.S.C. § 524(a)(2) fails to satisfy the civil contempt standard under *Taggart v. Lorenzen*, 139 S. Ct. 1795 (2019). We agree with Citi's first argument but disagree with the second. Accordingly, we **AFFIRM IN PART** and **REVERSE IN PART** the bankruptcy court's order and **REMAND** the case to the bankruptcy court for further proceedings consistent with this opinion.

————————————

GEORGE F. CARPINELLO, Boies Schiller Flexner LLP, Albany, NY (Adam R. Shaw, Jenna C. Smith, Boies Schiller Flexner LLP, Albany, NY; Charles Juntikka, Charles Juntikka & Associates LLP, New York, NY, *on the brief*), *for Plaintiff-Appellee*.

EAMON P. JOYCE (Benjamin R. Nagin, Jonathan W. Muenz, James R. Horner, *on the brief*), Sidley Austin LLP, New York, NY, *for Defendants-Appellants*.

Robert J. Pfister, KTBS Law LLP, Los Angeles, CA, *for Amici Curiae National Consumer Bankruptcy Rights Center; National Association of Consumer Bankruptcy Attorneys in Support of Plaintiff-Appellee*.

————————————

WESLEY, *Circuit Judge*:

Unwelcome as insolvency may be, bankruptcy relief ultimately provides hope for the debtor that a new financial life awaits. The notion of a fresh start is at the Bankruptcy Code's core and is typically achieved through a discharge order, which, at a bankruptcy proceeding's conclusion, releases the debtor of

pre-bankruptcy debts covered by the order, and acts as an injunction to bar creditors from further attempts to collect those debts. *See* 11 U.S.C. § 524(a)(2).

In this case, a putative nationwide class of former debtors, led by Kimberly Bruce, claim that Citi violated their respective discharge injunctions. They ask that Citi be held in contempt, and, in addition to contempt sanctions, ask for declaratory relief and restitutionary damages.

As an initial matter, we reject plaintiff's suggestion that she has asserted separate and distinct claims for declaratory relief and damages. For one, plaintiff's characterization of her complaint is in tension with the complaint itself, which asserts a single cause of action claiming that "[d]efendants have violated § 524(a)(2) and are in contempt of this Court." App'x 75. Furthermore, as Citi points out on reply, plaintiff has previously referred to this action as "a proceeding for contempt," *see* Brief of Plaintiffs-Appellees at 3, *In re Nyree Belton, Kimberly Bruce*, No. 19-648 (2d Cir. Nov. 11, 2019), ECF No. 105—as has this Court, *see In re Belton v. GE Cap. Retail Bank*, 961 F.3d 612, 616 (2d Cir. 2020) ("[T]he Debtors have pursued this remedy through a contempt proceeding."). Accordingly, we consider only plaintiff's motion for contempt.

Relatedly, plaintiff's class-wide contempt proceeding hinges on a bankruptcy court's authority under the Code to hold a creditor in civil contempt for violating discharge orders entered by other bankruptcy courts across the country. The bankruptcy court declined to dismiss plaintiff's class-wide request that Citi be held in contempt and sanctioned. It concluded that its contempt power extends to the enforcement of other bankruptcy courts' discharge injunctions. We disagree that a bankruptcy court has the authority to hear and adjudicate a class-wide contempt proceeding. That leaves only plaintiff's individual claim against Citi.

Accordingly, the final question in this appeal is whether plaintiff's allegations that Citi should be held in contempt for violating her discharge order are sufficient to survive Citi's Rule 12(b)(6) threshold attack.[2] The bankruptcy court answered that question in the affirmative. We agree. Accordingly, we affirm in part and reverse in part, and remand for further proceedings consistent with this opinion.

---

[2] The sufficiency of a complaint in an adversary proceeding is evaluated under Federal Rule of Civil Procedure 12(b)(6). *See* Fed. R. Bankr. P. 7012(b).

# BACKGROUND

## I.     Facts

This dispute began in 2009, when Kimberly Bruce, plaintiff in this action, stopped making payments on her Citi credit card account.  Eventually, Citi informed credit reporting agencies that she had a balance due of $1124, which Citi "charged off"—that is, adjusted from a receivable to a loss in the bank's internal accounting books.

Years later, plaintiff voluntarily filed a Chapter 7 bankruptcy petition in which she listed Citi as a creditor.  Her complaint alleges, without any dispute from Citi, that she provided Citi notice of her initial bankruptcy filing and her eventual discharge order, entered in May 2013.  That order "released" plaintiff from "all dischargeable debts," App'x 29, and enjoined "any attempt to collect from the debtor a debt that has been discharged," *id.* at 30.

In September 2013, months after her fresh financial start, plaintiff accessed her credit report and discovered that it still listed her debt with Citi as "charged off," without any indication it had been discharged in bankruptcy.  She notified Citi in December 2013 that its description of her Citi account status—also known

as a "tradeline"—on her report was incorrect and requested that the bank remove the charge-off notation. Citi, she says, refused.

In March 2014, plaintiff successfully moved to reopen her Chapter 7 case and commenced an adversary proceeding seeking to hold Citi in contempt of her bankruptcy discharge order. About two weeks after plaintiff moved to reopen, Citi finally contacted the credit reporting agencies and requested that they remove the charge-off notation on the tradeline referring to plaintiff's credit card account.

Plaintiff alleges that Citi's refusal to correct her credit report is part of a "willful policy of attempting to lay a trap for Plaintiff and other Class Members until the point that they need an accurate credit report, and they cannot obtain such a credit report without paying on a discharged debt." App'x 61. Citi lays this "trap" by "refusing the debtors' requests to remove 'charge offs' and other similar 'past due' notations . . . despite [Citi's] knowledge that such debts have in fact been discharged in bankruptcy." *Id.* at 69–70. "These notations adversely affect Plaintiff's and every Class Member's ability to obtain credit or employment and have the inherent coercive effect of inducing Plaintiff and all other Class Members to make payment on the debt." *Id.* at 68–69.

Plaintiff claims that Citi financially benefits from the policy: third-party debt collection agencies—such as Midland Funding LLC, which, prior to plaintiff's bankruptcy, purchased plaintiff's delinquent debt—will pay a higher price to Citi if they believe Citi will not update debtors' credit reports, thereby increasing the likelihood that, notwithstanding a discharge, confused debtors might nonetheless pay off their cards. In essence, plaintiff claims that Citi's post-bankruptcy discharge policy increases, in the eyes of the third-party debt collection agencies, the value of the delinquent debt at the front end, when the agencies purchase that debt.

Plaintiff also contends that although Citi sold plaintiff's debt, it maintains ties to it in other ways. For example, she alleges that Citi collects the discharged debt on behalf of the third-party debt collection agencies, and that credit reporting agencies will not permit those agencies (including Midland) to request changes in tradelines listed in the original creditor's name. She adds that Citi remained identified as the creditor in the tradeline, notwithstanding that it sold plaintiff's debt to Midland. Thus, she continues, Citi knows that unless it correctly reports

the bankruptcy discharge's effect on the otherwise delinquent debt, the tradeline will remain in error.

Plaintiff alleges that by willfully failing to update credit reports, Citi is "in contempt of this Court," App'x 75, she "prays that the practices of [Citi] be declared to be in violation of the rights of Plaintiff and Class Members under the Bankruptcy Code and a contempt of the statutory injunction set forth in § 524(a)(2)," *id.* at 76, and she asks that the bankruptcy court "order that defendants be held in contempt of court," *id.* She also seeks to certify a nationwide class of former debtors on the ground that Citi similarly refused numerous post-discharge requests to correct erroneous tradelines.

## II.    Procedural History

This case has made its way to this Court once before. At its outset, Citi moved to compel arbitration based on its credit card agreement with plaintiff. Relying largely on our decision in *In re Anderson*, 884 F.3d 382 (2d Cir. 2018), this Court affirmed the district and bankruptcy courts' denial of that motion, reiterating that contempt proceedings for violations of § 524(a)(2) are not arbitrable, and are instead subject to the bankruptcy court's exclusive

enforcement.  *See In re Belton*, 961 F.3d at 616–17 (citing *In re Anderson*, 884 F.3d at 389–92).

On remand, Citi moved to dismiss plaintiff's complaint, or in the alternative, to strike or dismiss her class allegations.  The bankruptcy court, in the decision Citi now appeals, largely rejected the bank's request.  Although it dismissed plaintiff's request for injunctive relief, it otherwise denied Citi's motion.[3]

The bankruptcy court purported to resolve two questions: first, whether plaintiff plausibly pleaded a discharge violation under Federal Rule of Civil Procedure 12(b)(6), and, second, whether one bankruptcy court has the authority to determine a creditor in contempt of a discharge order entered by another bankruptcy court.

With respect to the 12(b)(6) issue, the bankruptcy court concluded that plaintiff plausibly stated a claim for relief.  It explained that while mere inaccurate credit reporting without some further act does not violate the discharge, plaintiff

---

[3] Regarding plaintiff's request for injunctive relief, the bankruptcy court held that because the discharge under § 524 acts as a statutory injunction against further efforts to collect on discharged debts, there was "already an injunction."  App'x 188.  Plaintiff does not challenge that ruling here.

had sufficiently pleaded that Citi's refusal to correct her (and class members') tradeline(s) is pursuant to a willful policy of pressuring former debtors to pay off discharged debts. In measuring the adequacy of the complaint, the court employed the Supreme Court's decision in *Taggart v. Lorenzen*, in which the Supreme Court held that a bankruptcy court may hold a creditor in civil contempt when there is objectively "no fair ground of doubt" that the alleged violator's action did, in fact, violate the discharge. 139 S. Ct. 1795, 1799 (2019).

The court then turned to the nationwide class issue and rejected Citi's motion to strike plaintiff's class allegations. Although it acknowledged that whether one bankruptcy court can enforce other bankruptcy courts' discharge orders "raise[s] a very close question," App'x 264, it grounded that authority in § 105 of the Bankruptcy Code, which provides that a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out" the Code. 11 U.S.C. § 105.

After the district court certified the bankruptcy court's order for direct appeal, App'x 291, this Court granted Citi's request for leave to appeal, *id.* at 293.

10

# DISCUSSION[4]

This appeal principally concerns § 524(a)(2) of the Bankruptcy Code, which provides that a bankruptcy discharge:

> [O]perates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived.

11 U.S.C. § 524(a)(2). The section invokes an injunction that takes effect with the discharge order. Together the order and injunction aim to prevent debtors from being "pressured" to repay discharged debts. *In re Kalikow*, 602 F.3d 82, 96 (2d Cir. 2010) (internal quotation marks omitted). Like many parties aggrieved by the violation of an injunction outside of the bankruptcy context, aggrieved debtors have resorted to civil contempt proceedings to vindicate their rights under the discharge order. *See, e.g.*, *In re Belton*, 961 F.3d at 616; *see also* 4 *Collier on Bankruptcy* ¶ 524.02[2][c] (2023).

---

[4] The denial of a motion to dismiss is reviewed *de novo*. *Rothstein v. Balboa Ins. Co.*, 794 F.3d 256, 261 (2d Cir. 2015). Additionally, as the parties agree, Citi's motion to strike or dismiss plaintiff's class allegations presents a pure question of law; the bankruptcy court's decision on that issue therefore constitutes a legal determination likewise meriting *de novo* review. *See In re Anderson*, 884 F.3d at 387.

In this case, however, plaintiff sets her sights broadly; she seeks relief on behalf of herself and a nationwide class, accusing Citi of uniformly flouting the discharge orders of similarly situated debtors across the country. Citi's abusive practices, according to her, are pervasive.

Plaintiff's careful, even novel, pleading strategy raises a threshold issue. The viability of her nationwide pursuit depends on the authority of one bankruptcy court to enforce the discharge orders and injunctions entered by other bankruptcy courts from across the country. It is a novel, broad vision of an injunction's enforcement mechanism, and raises thorny issues regarding one bankruptcy court's ability to hold a party in civil contempt on behalf of other bankruptcy courts whose separate discharge orders are alleged to have been violated.

## I. The Bankruptcy Code does not authorize a bankruptcy court to enforce another bankruptcy court's discharge injunction.

Plaintiff asks that the bankruptcy court entertain a nationwide class action contempt proceeding, comprised of the mirroring claims of other discharged debtors who, like plaintiff, requested to no avail that Citi correct their erroneous tradelines. Specifically, the putative class invites the bankruptcy court to enforce

12

not just the discharge order it entered in plaintiff's case, but also those entered for similarly situated debtors by bankruptcy courts across the country.

The class-wide relief sought by plaintiff raises a fundamental question: does the Bankruptcy Code authorize one bankruptcy court to employ its contempt power on behalf of other bankruptcy courts in a nationwide class action to enforce those bankruptcy courts' discharge orders?[5]

Neither this Court nor the Supreme Court has confronted the issue. However, decisions from both courts, as well as from the courts of appeals that have weighed in on the matter, help guide the way. In the end, as has long been the case outside of the bankruptcy context, a particular bankruptcy court's civil contempt authority does not extend beyond the enforcement of its own orders.

For example, although *Taggart* sets forth the "fair ground of doubt" standard governing a bankruptcy court's exercise of its civil contempt authority to enforce § 524(a)(2)'s discharge injunction—a matter somewhat adjacent to the

---

[5] Plaintiff spends much of her brief defending the bankruptcy court's subject matter jurisdiction to adjudicate the nationwide class claims. But "[t]he nature of the relief available after jurisdiction attaches is, of course, different from the question whether there is jurisdiction to adjudicate the controversy." *William E. Arnold Co. v. Carpenters Dist. Council*, 417 U.S. 12, 19 (1974).

nationwide class issue—the Supreme Court's analysis is instructive. The Court has explained that § 524(a)(2)'s injunction, along with the bankruptcy court's § 105 authority to issue any "order" or "judgment" that is "necessary or appropriate" to "carry out" other bankruptcy provisions, "bring with them the 'old soil' that has long governed how courts enforce injunctions." 139 S. Ct. at 1801. From there, the Court cautioned that although this "old soil" includes "civil contempt," the bankruptcy statutes "do not grant courts unlimited authority to hold creditors in civil contempt." *Id.* Instead, they incorporate "traditional standards in equity practice for determining when a party may be held in civil contempt for violating an injunction," and, to pinpoint those standards, looked to "cases outside the bankruptcy context." *Id.*

*Taggart* therefore provides a framework for analyzing the limits of a bankruptcy court's civil contempt authority. Courts should understand that authority as coextensive with—not greater than—the civil contempt authority wielded by courts outside of bankruptcy. In short, well-established equity practice regarding the judicial exercise of civil contempt authority guides any inquiry into what that authority looks like in the bankruptcy context.

Emerging from the "'old soil' that has long governed how courts enforce injunctions," *id*., is the longstanding equitable principle that "civil contempt proceedings leave the offended judge *solely responsible* for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994) (emphasis added); *see also In re Debs*, 158 U.S. 564, 595 (1895); *Waffenschmidt v. MacKay*, 763 F.2d 711, 716 (5th Cir. 1985) ("Enforcement of an injunction through a contempt proceeding must occur in the issuing jurisdiction because contempt is an affront to the court issuing the order."); Fed. R. Civ. P. 4.1 Advisory Committee Notes to 1993 Amendment ("Contempt proceedings, whether civil or criminal, must be brought in the court that was allegedly defied by a contumacious act."); *cf. Klett v. Pim*, 965 F.2d 587, 591 (8th Cir. 1992) (explaining that the "plain meaning" of the contempt statute, 18 U.S.C. § 401, "prevents a federal court from imposing a sanction for contempt of another court's injunction"). This Court has long followed this equitable principle. *See, e.g., Stiller v. Hardman*, 324 F.2d 626, 628 (2d Cir. 1963) (denying enforcement of an injunction in a New York court that was issued by an Ohio court because

"[v]iolation of an injunctive order is cognizable in the court which issued the injunction").

Plaintiff fails to offer a single example of one court exercising its civil contempt authority on behalf of another court's injunction.[6] Nor are we aware of any. As telling as that gap is, it's of no surprise. The civil contempt power is, at its core, uniquely personal to each court; by providing a mechanism to mandate compliance when a court is confronted with disobedience, it is a necessary corollary to a court's authority to issue binding orders. "Courts thus have embraced an inherent contempt authority . . . as a power necessary to the exercise

---

[6] Indeed, plaintiff has failed to offer any compelling examples of one court enforcing injunctions entered by another court—even without resorting to its civil contempt authority. The cases she cites concern statutory grants of power which in specific, limited cases broaden a court's power to protect or provide relief from orders entered by other courts. *See, e.g.*, *Smith v. Woosley*, 399 F.3d 428, 433–34 (2d Cir. 2005) (construing the relitigation exception to the Anti-Injunction Act, 28 U.S.C. § 2283); *Smith v. New York*, No. 12 Civ. 4851, 2014 WL 6783194 (E.D.N.Y. Dec. 2, 2014) (analyzing Fed. R. Civ. P. 60(b)(6), which authorizes courts to provide relief from final judgments based on extraordinary circumstances). No doubt, Congress is free to pass laws which provide for departures from longstanding equity practice. Yet "a major departure from the long tradition of equity practice should not be lightly implied." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). These cases hardly establish an across-the-board rule that one court may enforce another court's injunction. Accordingly, even if plaintiff's complaint is construed as asserting separate and distinct causes of action including, but not limited to, a claim for contempt—a characterization which, as explained above, we reject—it is far from clear that her quest for class-wide relief would be any less difficult.

of all others." *Bagwell*, 512 U.S. at 831 (internal quotation marks omitted); *see also Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 454 (1932) ("[T]he proceeding for civil contempt for violation of the injunction should be treated as a part of the main cause."). Against this backdrop, plaintiff's theory of a free-wielding contempt authority, capable of exercise by one court on behalf of another court, would "present the anomalous proceeding of one court taking cognizance of an alleged contempt committed before and against another court, which possessed ample powers, itself to take care of its own dignity and punish the offender." *Ex parte Bradley*, 74 U.S. 364, 372 (1868); *see also Myers v. United States*, 264 U.S. 95, 104 (1924) ("By disobeying the order, plaintiffs . . . defied an authority which *that tribunal* was required to vindicate." (emphasis added)).

Further still, a court's broad authority to identify, prosecute, adjudicate, and sanction contumacious conduct makes for a "potent weapon," *Taggart*, 139 S. Ct. at 1801, which, in *Taggart*, undergirded the Supreme Court's conclusion that civil contempt should not be employed where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct. Heeding the Supreme Court's cautionary approach, we decline to expand the availability of a bankruptcy court's

civil contempt authority to any similarly aggrieved party, anywhere in the country, that comes before one court seeking relief from an alleged contemnor's comparable affront to a different court. Doing so could "wreak havoc on the federal courts to leave enforcement of the injunctive order of a bankruptcy court in one district to the interpretive whims of a bankruptcy court in another district." *Alderwoods Grp., Inc. v. Garcia*, 682 F.3d 958, 970 (11th Cir. 2012).

Plaintiff's reasoning is also in tension with our repeated observation that "a bankruptcy court has 'unique expertise in interpreting its own injunctions and determining when they have been violated.'" *In re Gravel*, 6 F.4th 503, 513 (2d Cir. 2021) (quoting *In re Anderson*, 884 F.3d at 390–91); *see also In re Belton*, 961 F.3d at 617. She acknowledges as much, but contends that, unlike a judge-crafted, "bespoke" injunction, the generally uniform nature of § 524(a)(2)'s statutory injunction minimizes the unique insight courts normally have into their own injunctions. *See* Appellee Br. at 35–37.

As an initial matter, we rejected that line of argument in *Anderson*, and again in *Belton*. Specifically, the appellant in *Anderson* advocated for the arbitrability of discharge violation claims by arguing that because the discharge injunction under

§ 524(a)(2) arises from statute and is executed by a bankruptcy court on a standard form using boilerplate language, "the unique powers of the bankruptcy court are not implicated in any meaningful way." 884 F.3d at 391. We saw it differently, reasoning that "[n]either the statutory basis of the order nor its similarity—even uniformity—across bankruptcy cases alters the simple fact that the discharge injunction is an order issued by the bankruptcy court and that the bankruptcy court alone possess the power and unique expertise to enforce it." *Id.*

Similarly, upon Citi's request in *Belton* to reconsider our holding in *Anderson*, we reaffirmed the non-arbitrability of § 524(a)(2) discharge violations, explaining—at plaintiff's urging—that the "issuing court is uniquely positioned to assess" the various considerations at play in contempt proceedings. *In re Belton*, 961 F.3d at 617.

True, discharge orders, which might often be issued on standard forms,[7] trigger a statutory, rather than a judge-crafted, injunction. Yet, beyond the mere

---

[7] Citi points out that the discharge order form utilized by the bankruptcy court below differed from the standard form available on the federal government's website. *See* Appellant Br. at 65 (*comparing* App'x 29 with Form B 18 [https://www.uscourts.gov/forms/bankruptcy-forms/discharge-debtor]).

determination whether a discharge order has been violated, the appropriateness of civil contempt sanctions, and in what form, are considerations that can still benefit from the unique insight a bankruptcy court can gain in presiding over a proceeding. *Taggart* makes that much clear; the Court provided that "a party's record of continuing and persistent violations and persistent contumacy," on the one hand, and, on the other hand, "a party's good faith, even where it does not bar civil contempt, may help to determine an appropriate sanction." 139 S. Ct. at 1802 (internal citations and quotation marks omitted). Plainly, the bankruptcy court's familiarity with the matter remains important.

In any event, *Taggart* does not suggest that the statutory basis of the discharge injunction is of any significance in determining its manner of operation or how it might be enforced. To the contrary, the Supreme Court made clear that "traditional civil contempt principles apply straightforwardly to the bankruptcy discharge context," *id.*, and as explained above, a straightforward application of longstanding civil contempt principles suggests that only the issuing court may exercise its civil contempt powers to enforce its discharge order, and the injunction which springs from it.

At bottom, plaintiff seeks a bankruptcy-specific expansion of the civil contempt power beyond its longstanding limits at equity. Congress is capable of intervening to guide the exercise of a bankruptcy court's civil contempt power. But "a major departure from the long tradition of equity practice should not be lightly implied." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Zuckerman v. Metro. Museum of Art*, 928 F.3d 186, 196 (2d Cir. 2019). Nothing in the Code suggests that Congress intended to displace well-established principles regarding the exercise of the civil contempt power.

Although the bankruptcy court grounded its authority in §§ 524 and 105, *Taggart* examined those provisions and concluded they incorporate traditional standards of equity practice, *see Taggart*, 139 S. Ct. at 1801, which, as provided above, includes the principle that a court cannot exercise its civil contempt authority to enforce another court's injunction. Moreover, as the Fifth Circuit explained in *Crocker*, the Bankruptcy Code, at one time, provided that an order of discharge could be registered in another district and "enforced in like manner" in the new district as in the issuing district. *See In re Crocker*, 941 F.3d 206, 213 (5th Cir. 2019) (quoting Pub. L. No. 91-467, § 3, 84. Stat. 990, 991). However, upon the

adoption of the Bankruptcy Code in 1978, that provision was revised to remove that language. *See id.* Current Federal Rule of Bankruptcy Procedure 4004(f) "guides registration but does not authorize 'like manner' enforcement as did its predecessor." *In re Crocker*, 941 F.3d at 214. We presume that Congress's removal of this language "entail[ed] a change in meaning." *See Yu v. Hasaki Rest., Inc.*, 944 F.3d 395, 418 (2d Cir. 2019) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 256 (2012)); *see also id.* ("Statutory history is . . . an accepted and uncontroversial tool in the interpretation of statutory texts." (citation omitted)). Plaintiff's version of a more robust civil contempt power may have once found, but no longer finds, support in the Code.[8]

In sum, there may be policy considerations that counsel in favor of a nationwide mechanism for a class of former debtors to enforce their respective discharge orders against a common creditor's systemic disruption of their new

---

[8] The bankruptcy court minimized the significance of this statutory history, pointing to Rule 4004(f)'s language that "the order of discharge shall have the same effect as an order of the Court of the district where registered." App'x 266 (quoting Fed. R. Bankr. P. 4004(f)). Yet whether an injunction has force beyond where it was originally issued is a different question than the nature and availability of the means to enforce that injunction. Rule 4004(f) simply makes clear that, upon registration, a party's legal duty to comply with the injunction extends to the district of registration. It does not speak to how an aggrieved debtor might remedy violations that occur in the new district.

financial lives.  Indeed, given the "fresh start" philosophy underlying the Code, establishing a broad enforcement mechanism for § 524, or expanding a bankruptcy court's civil contempt powers with respect to discharge orders, may likely be good policy.  But courts must take statutes as they find them, and, as written, the Code leaves intact the longstanding equitable principles regarding the enforcement of injunctions.  A bankruptcy court's civil contempt authority does not extend to other bankruptcy courts' discharge orders in a nationwide class action.  The class-wide relief sought by plaintiff is therefore unavailable under the Bankruptcy Code.

## II.    Plaintiff has stated a claim for civil contempt under *Taggart*'s "fair ground of doubt" standard.

Only plaintiff's individual contempt claim remains.  *Taggart* provides the yardstick to measure her claim: a bankruptcy court may hold a creditor in civil contempt for violation of the discharge order only if, as an objective matter, "there is no fair ground of doubt as to whether the order barred the creditor's conduct." 139 S. Ct. at 1799 (emphasis omitted).

That standard is satisfied here.[9]  As provided above, plaintiff alleges that,

post-bankruptcy, the credit report's tradeline for her Citi credit card listed Citi as

a creditor and incorrectly listed her balance as "charged off" instead of discharged

in bankruptcy.  App'x 62.  She claims that she asked Citi to update the tradeline,

but the bank refused.  *Id.* at 63.  That refusal, she continues, is part of a deliberate

policy of coercing debtors to pay off discharged debts.  Plaintiff explains that Citi

is fully aware that its behavior is coercive because Citi mails "collection letters" to

debtors before their bankruptcy filings "stating that 'charge offs' will ruin their

ability to obtain credit and conversely promising to remove the 'charge off' if they

pay the delinquent debt in full."  *Id.* at 71.  After the bankruptcy filing and

discharge order, Citi "know[s] that the existence of such inaccurate information"

in the credit reports will "damage . . . credit ratings," and that debtors will "often

---

[9] Seeking to chart a path to relief in the event that her contempt claim fails, plaintiff argues that *Taggart*'s "fair ground of doubt" standard "does not speak at all" to whether she (and her proposed fellow class members) are entitled to declaratory relief and damages. Appellee Br. at 24.  That is an issue we need not decide given that plaintiff has cleared *Taggart*'s high bar; a successful contempt claim is necessarily accompanied by a determination that the creditor violated the discharge order, and opens the door to recovery of damages, including restitution.  Whether and to what extent relief short of contempt sanctions is available in the case of a discharge violation for which a fair ground of doubt remains is a question for another day.

24

feel it necessary to pay off the debt despite [the] discharge in order to remove the inaccurate information from their credit reports." *Id.* at 70.

She also explains, in a nonconclusory fashion, the way Citi financially benefits from the practice: third-party debt collection agencies "are willing to pay more" for Citi's delinquent receivables given that, due to the confusion created by Citi's policy, the agencies "know they can collect on discharged debts." *Id.* at 64. Accepting these allegations as true, plaintiff has plausibly alleged that Citi employs a policy and practice of refusing to correct erroneous tradelines to coerce payment of discharged debts. In short, plaintiff plausibly alleges that Citi's refusal to correct her tradeline was objectively, and purposively, coercive. *See In re Pratt*, 462 F.3d 14, 19 (1st Cir. 2006).

Citi offers various arguments as to why plaintiff's allegations fall short. None persuade. Citi claims, for example, that § 524(a)(2) applies only to affirmative efforts to collect a discharged debt, but that plaintiff alleges, at best, that Citi merely failed to ask credit reporting agencies to update a tradeline on an account Citi had sold years earlier. *See* Appellant Br. at 33–34. Failing to act, the bank says, cannot amount to a discharge violation.

Faithfully read, the complaint describes a course of conduct by Citi which includes, but is not limited to, Citi's refusal to correct post-discharge tradeline errors. As detailed above, plaintiff explains (a) how and why the post-discharge "charged off" notation pressures former debtors; (b) how Citi takes advantage of, and financially benefits from that fear; and (c) how Citi's post-discharge control of the tradeline, despite selling the debt to third-party debt collection agencies, plays an important part in Citi's scheme.

Taken together, plaintiff plausibly claims that Citi's refusal to correct the tradeline at plaintiff's request was part of a systematic effort to pressure or coerce plaintiff (and similarly situated debtors) to pay off her (and their) discharged debt. Plaintiff pleads facts which, taken as true, establish an intentional course of conduct aimed at collecting discharged debts. In other words, although the "failure of a furnisher of credit information to take affirmative steps to update the information that it has reported on a consumer's account is not, standing alone, a violation of [§] 524(a)(2)," *In re Ho,* 624 B.R. 748, 755 (Bankr. E.D.N.Y. 2021), plaintiff's allegations are not so limited.

Consequently, there is no § 524 "affirmative act" deficiency here. An intentional and systematic refusal to update the credit report upon the debtor's request constitutes "an act to collect" under § 524(a)(2) where, objectively, it has the practical effect of improperly coercing the debtor into paying off a discharged debt. *See Roth v. Nationstar Mortg., LLC (In re Roth)*, 935 F.3d 1270, 1276 (11th Cir. 2019); *Venture Bank v. Lapides*, 800 F.3d 442, 448 (8th Cir. 2015); *In re Paul*, 534 F.3d 1303, 1308 (10th Cir. 2008); *In re Pratt*, 462 F.3d at 19. As provided above, the connection between Citi's course of conduct—including its refusal—and its objective, coercive effect on discharged debtors is obvious.

Citi also suggests that having sold plaintiff's debt to Midland pre-bankruptcy, it was no longer her creditor, and therefore is beyond § 524(a)(2)'s reach. Not true. As an initial matter, the bankruptcy court's discharge order explained that it "prohibits any attempt to collect from the debtor a debt that has been discharged." App'x 30. Although the order provided elsewhere that all "creditors" are enjoined from "engaging in any act to collect [] debts . . . of the debtor," *id.* at 29, it also made clear that its reach applied more broadly, that is, to all efforts to collect a discharged debt. *See also* 11 U.S.C. § 524(a)(2) (enjoining "an

act to collect, recover, or offset any such debt" without specifying that only current creditors are enjoined).

Moreover, plaintiff alleges that despite the sale to Midland, Citi continued to appear as the sole creditor on the tradeline, and that, by collecting discharged debts and forwarding those payments to Midland, Citi acted as Midland's agent and remained involved in the collection of discharged debt—and the value of that involvement generally was reflected in the premium Midland paid Citi for plaintiff's debt. App'x 71. Indeed, plaintiff alleges that under the terms of Citi and Midland's agreement, only Citi may "report the sold debts as sold or transferred" and "Midland will not be responsible for correcting or updating information on any debts listed in" Citi's name. *Id.* at 64. The complaint thus plausibly alleges that Citi is "fully aware that [its] deliberate failure to update a discharged debtor's . . . account coerces the debtor to pay said account." *Id.* at 71. We decline to impose a rule whereby creditors can avoid their obligations under a discharge order by

covertly passing their debt off to third parties.  Citi remained within § 524(a)(2)'s

reach.[10]

Throughout its brief, Citi relies on this Court's decision in *In re Kalikow*, 602

F.3d 82 (2d Cir. 2010).  That case makes clear that discharge orders are not so

limitless to extend to debts incurred post discharge, or to third parties who have

"no relation to the reorganization proceedings," *id.* at 95, no interest, either

indirectly or indirectly, against the debtor, and who did nothing to pressure the

debtor into paying a discharged debt.  *Id.* at 95–96.  That's not this case.  Far from

having no relation to the reorganization proceeding, plaintiff alleges that she listed

her debt with Citi in her bankruptcy petition and provided Citi notice both of that

fact, as well as of her eventual discharge.  Plaintiff also explains how Citi maintains

an interest against the debtor; she describes in detail the way Citi retains control

over the tradeline, as well as why its policy of refusing to correct the tradeline is

designed to coerce discharged debtors into paying off discharged debts.

---

[10] Citi also seeks to draw on its obligations under the Fair Credit Reporting Act ("FCRA"), which, it argues, places the burden of substantively responding to bankruptcy-related credit reports requests on the credit reporting agencies, rather than the furnishers of that information.  Citi's obligations under the FCRA are not determinative of its obligations under the Bankruptcy Code.

At bottom, accepting her nonconclusory allegations as true and drawing reasonable inferences in her favor, plaintiff has plausibly alleged that Citi's refusal to correct her tradeline stems from a policy of coercing unwitting debtors to pay off discharged debts. There is no fair ground of doubt that, if true, Citi's conduct amounts to a violation of the discharge. *See Taggart*, 139 S. Ct at 1799. We therefore affirm the bankruptcy court's denial of Citi's motion to dismiss plaintiff's individual contempt claim.

## CONCLUSION

Accordingly, we **AFFIRM IN PART and REVERSE IN PART** the bankruptcy court's order and **REMAND** for further proceedings consistent with this opinion.